JOHN P. BEEKMAN, adm'r with the will annexed of William Barthop deceased, *vs.* THE PEOPLE OF THE STATE OF NEW YORK, MARY BONSOR and others,

A testator, by a codicil to his will, dated May 12, 1838, made the following bequests : " After the expiration of ten years, or sooner, if my executors find there will be sufficient funds, I would wish a public dispensary as in New York, on a similar plan for indigent persons, both sick and lame, to be attended by a physician to be elected to the establishment, at their own homes, and also daily at the dispensary. My executors to consult judicious men in Albany, respecting the same, and funds enough to carry on the building and yearly expenses. And should there be any overplus, my executors, within fifteen years, may give it to any other charitable society or societies for relieving the comfortless and indigent they shall select. * * * It is my will that my executors have a discretionary power, or a majority of them, within fifteen years after my decease, to pay over what remains after all legacies paid, the residue and remainder of moneys arising from my worldly goods and effects to such charitable societies for indigent and respectable persons, especially females and orphans, as they in their discretion shall think of." By another codicil, executed October 13, 1838, before any money was appropriated for the establishment of a dispensary, as provided for in the first codicil, the testator gave to his executors, in trust, the sum of $19,000, to be appropriated in their discretion to certain societies ; adding—" But should my executors be of the opinion, at any time, that any or either of said societies do not merit the provision aforesaid, for their benefit, &c., then I direct that the moneys then remaining unpaid shall be withheld, and that they shall pay and apply the same to any other charitable society or societies, incorporated or not, which my said executors shall in their discretion think proper," &c. The societies mentioned by the testator were not in existence at the time of his death.

*Held,* 1. That it was the intention of the testator to provide the means to erect and establish a dispensary for indigent persons ; that the terms used by him in expressing that intention necessarily implied a direction to purchase land on which to erect a building ; and that his estate was given to his executors for the purpose thus indicated.

2. That this bequest, to be effectual, imposed the necessity of creating a trust in lands, of a nature prohibited by the statute of uses and trusts, and was therefore null and void.

3. That the bequest of any possible surplus which might remain after establishing the dispensary, was also void, for the reason that it was utterly impossible to ascertain the amount of that surplus, except by the actual execution of the prior purpose of the testator respecting the dispensary, which purpose could not be carried out.

Beekman *v.* The People.

4. That the bequest for the establishment of the dispensary could not be sustained on the ground of its being a bequest for a charitable and pious use.

5. That the executors having renounced, the trust relative to the dispensary failed; and that it could not be carried into effect upon the doctrine of executing wills *cy pres;* no court in this state having the right to exercise the *cy pres* power, by framing a scheme to carry out a radically imperfect and indefinite execution. That it consequently followed that, as to such portion of the estate of the testator as was involved in that bequest, he died intestate. And further, that such portion did not fall into the residue, and did not pass by the disposition of the overplus, on the supposition that such disposition was legal and could be upheld; but went to the next of kin.

By the codicil, executed October 13, 1838, the testator bequeathed to his executors, in trust, all the residue of his estate, to pay and apply the same in such sums, and at such time and times, as they should think fit, to one or more societies, for the support of indigent respectable persons, " hereby intending to give to my executors full discretionary power as to the disposition of the same, but so that the same shall be applied to objects of charity."

*Held,* 1. That this, being a bequest for a general indefinite charitable purpose, without fixing itself upon any particular object, was void, and the estate went to the next of kin.

2. That it was the will of the testator that the persons named by him should be the almoners of his bounty; and they having refused to accept the trust, this bequest failed, and the will could not be executed by the exercise of the *cy pres* power, by framing a scheme for the charity, or by any other process.

3. That this provision in the codicil could not be regarded as a series of bequests to the societies indicated, for charitable purposes, and payment thereof bo decreed. That the discretion of the executors, which was to give the general indefinite charitable purpose locality and precision, by pointing out the objects of the charity, was gone and could never be exercised

A bequest of a sum of money in trust, to purchase a farm for the benefit of the children of the testator's sister, is a trust not authorized by our statutes of uses and trusts, and is therefore void.

WILLIAM BARTHOP died at Kinderhook on the 20th of October, 1838. He was a physician, born in Nottingham, England, and on settling at Kinderhook, married the widow of an old physician, Dr. Beekman, resident there, who had two sons, John, the plaintiff, and Thomas, one of the defendants. His wife survived him. By a codicil to his will, dated October 8, 1838, he gave her a legacy of $10,000. His will bears date October 9, 1837. By a codicil, dated May 12, 1838, he made the following bequests, which, with a subse-

quent one, made in another codicil, dated October 13, 1838, form the subject matter of the present controversy. The first bequest was as follows : " After the expiration of ten years, or sooner, if there be sufficient funds, I would wish a public dispensary, as in New York, on a similar plan, for indigent persons, both sick and lame, to be attended by a physician elected to the establishment, at their own homes, and also daily at the dispensary. My executors to consult judicious men in Albany, respecting the same, and funds enough to carry on the building and yearly expenses. And should there be any overplus, my executors within fifteen years, may give it to any other charitable society or societies, for relieving the comfortless and indigent they shall select. I say within fifteen years from my death. * * * I say it is my will that my executors have a discretionary power or a majority of them, within fifteen years after my decease, to pay over what remains, after all legacies paid, the residue and remainder of moneys arising from my worldly goods and effects to such charitable societies for indigent and respectable persons, especially females and orphans, as they, in their discretion, shall think of."

By the codicil of October 13, 1838, before any money was appropriated for the establishment of a dispensary, as provided for in the preceding codicil, he gave to his executors in trust the sum of $19,000, to be appropriated in their discretion to certain societies, which, it has been since ascertained, were not in existence at the death of the testator, and he added after such provisions, these words : " But should my executors be of the opinion, at any time, that any or either of said societies do not merit the provision aforesaid, for their benefit, by reason of mismanagement or negligence, or for any other cause, then and in that case it is my will, and I direct that the moneys then remaining unpaid · shall be withheld, and that they shall pay and apply the same to any other charitable society or societies, incorporated or not, which my said executors shall in their discretion think proper ; reposing full confidence in my executors that they will endeavor to carry into effect

my intentions in regard to the disposition of said moneys."
And in the same codicil he says, "And in the second place,
after satisfying the provisions in my will in regard to the dis-
pensary mentioned in my will in the first codicil thereto, I
give and bequeath all my estate then remaining, if any there
shall be, to my executors in trust, that they shall and may
apply the same in such sums, and at such time and times as
in their discretion they shall think fit and proper, to the treas-
urer or other officer, having the management of the pecuniary
affairs of any one or more societies for the support of indigent
respectable persons, especially females and orphans, and for
the use of said society or societies, hereby intending to give to
my executors discretionary power as to the disposition of the
same, *but so that the same shall be applied to objects of charity."*

The case was heard on pleadings and proofs, at special term,
where a decree or judgment was entered, sustaining the bequests
to the dispensary, and to the executors in trust for charitable
purposes, as good bequests for charities; and a reference was
ordered to a referee to ascertain and report a plan for the dis-
pensary, and all information concerning the same, to the end
that the same might be established, and carried into effect.
From that decree appeals were taken to the general term.

*John Van Buren,* for the plaintiff.

*William Kent,* for Thomas Beekman.

*Joseph Blunt* and *John H. Reynolds,* for the People.

*A. Underhill,* for Mary Bonsor and other defendants.

*By the Court,* DAVIES, P. J. A convenient consideration of
the questions presented, will lead naturally to an examination
in the first place of the provisions of the codicils in reference
to the dispensary. If it should be found that there were suffi-
cient funds, then the testator, as he expresses himself, wishes

" a public dispensary as in New York, *on a similar plan*, for indigent persons both sick and lame, to be attended by a physician elected to the *establishment*, at their own homes, and also daily at the dispensary. My executors to consult judicious men in Albany respecting the same, and funds enough to carry on the building and yearly expenses." In the codicil of October 13, 1838, the testator refers to this bequest, in these words "before any money is appropriated for the *establishment* of a dispensary, as provided for in one of the codicils to my will." It would seem, therefore, to be clear that it was the intention of the testator to devote so much of his estate as might be necessary, to the *establishment* of a public dispensary on a plan similar to that in New York, where indigent persons, both sick and lame, could be attended to daily by a physician elected to the *establishment*, and also at their own homes ; and that not only funds sufficient *for the establishment* of such a dispensary were to be provided, but also sufficient to carry on the building and the yearly expenses thereof.

No one can fail to see the intention of the testator, on reading these provisions. *The establishment* of a dispensary necessarily includes the procuring of a site and the erection of a suitable building. That a building was to be provided for is apparent from the provision to provide the expense of carrying it on, in addition to the yearly expenses of attending indigent persons, both sick and lame, daily at the *establishment*, and also at their own homes. The dispensary was to be on a plan similar to that in New York, which, as is well known, includes both a site and appropriate building.

That the will directs the establishment of a dispensary, and a building in connection therewith, would seem too plain to need further illustration, and such construction is, moreover, incontrovertibly established by judicial authorities. This being assumed, as we think it must be, it follows that the direction given in the will converts this fund into real estate, and the principles applicable to a devise of real estate for the purposes contemplated must govern. The leading case on this

point, and which struck us on the argument, as quite if not entirely controlling, is that of *Chapman* v. *Brown*, (6 *Ves.* 404.) In that case Elizabeth Brookes, by her will, after giving several legacies and making other dispositions, gave the *rest and residue* of her estate to her executors "for the purpose of building or purchasing a chapel for the service of Almighty God." "And desired that the chapel may be where it may appear to her executors to be most wanted; and if any overplus should remain from the purchasing or building the same," she requested that it might go to the support of a, faithful gospel minister, not to exceed £20 a year; and if, after that, any further overplus should remain, she desired that the same might be laid out in such charitable uses as her executors should think proper. It cannot escape attention, that the will in this case is almost identical with the provisions of that of Dr. Barthop. Chapman, one of the executors of Elizabeth Brookes' will, filed the bill, praying the execution of the trusts of the will. The heir at law claimed the real estate, and the next of kin claimed the personal estate. On the part of the heir and next of kin it was contended that the devise, as to the land, clearly could not be executed by the court, for the reason that it was contrary to the statute of 9 Geo. 2, ch. 36, known as the mortmain act. As to the personal estate, it was insisted that it was so given that an investment in land must necessarily have been in the contemplation of the testatrix, and if so, the same result would follow. Sir William Grant, the master of the rolls, held in that case, that as to the real estate, the devise was void; and adds, that by the next of kin it is contended that the disposition is void, so far as it directs the residue of the estate to be laid out in building or purchasing a chapel; and that it was contended by the attorney general, on behalf of the charity, that it being in the alternative *to build or purchase*, if either of those purposes could be legally effected, the trust ought to be carried into execution. It was insisted that the purpose to build a chapel upon grounds already in

mortmain, is legal, though to purchase ground for the pur-
pose of building a chapel was not legal.

The case of *Attorney General* v. *Bowles*, (2 *Ves. sen.* 547,)
was cited as an authority, that when there is a bequest of
money to be laid out in building a chapel or school, the in-
tention must be presumed to be to build, in case a piece of
land could be found, already in mortmain. The decision of
Lord Hardwicke, in that case, overruled as it has been, by a
great number of subsequent decisions, was influenced by his
desire to uphold a charity, and for this purpose he held that
such an intention might be presumed. The first case over-
ruling this doctrine, is that of the *Attorney General* v. *Tyn-
dall*, (*Amb.* 614,) referred to by Lord Bathurst in *Attorney
General* v. *Hutchinson*, (*Id.* 751.) In the case before Lord
Henley, the direction was expressly to purchase, and no op-
tion was allowed. Sir William Grant says : " All the lean-
ing of Lord Henley went in direct contradiction to the former
case. He held that the statute had two objects; 1st. That
you shall not give *land* for the benefit of a charity; 2d. That
you shall not *realize* for the benefit of a charity; that the
mischief is the same, for if that precedent was to prevail, a
piece of ground that was only worth £50, might be made
worth £20,000, which undoubtedly is putting it in mort-
main." He further says : " But a case directly in point oc-
curred before Lord Northington, in 1764, *Pelham* v. *Anderson*,
(1 *Brown C. C.* 444, *in note.*) There £2000 were given to
build or erect a hospital. This disposition was determined
by him to be void. By this case the court directly overrule
the *Attorney General* v. *Bowles*, the purpose of the testator
in both cases being precisely the same. Then came the case
of the *Attorney General* v. *Hutchinson*, to which I have
already alluded, in 1775, (*Amb.* 751 ; *S. C.* 1 *Bro. C. C.* 444,
*in a note,*) where the bequest was, according to the report in
Ambler, for the purpose of *erecting* (and according to the
note in Brown, *for erecting and building*) a free school. A
strong circumstance in the case was, that there was in the

parish a piece of ground in mortmain, upon which a school had formerly been erected; and it was contended that this fact was in the testator's contemplation, and that his intention was to re-erect the school upon the former foundation. But Lord Bathurst thought that as the testator had not himself pointed to such intention, it was not to be presumed by the courts. Therefore it was to be taken as a mere bequest for the purpose of erecting or building a school, and it had been determined in *Pelham* v. *Anderson*, and the other cases, that such a bequest was void." He further adds: "Then the case of *Foy* v. *Foy*, (*at the Rolls, Feb.* 1, 1785, *cited* 3 *Bro. C. C.* 591,) occurred, which went much further than either of these cases. There the legacy was given towards the erection and endowment of an hospital. Lord Hardwicke, in *Vaughan* v. *Farrer*, (2 *Ves.* 182,) and in *Gastril* v. *Baker*, (*cited also as Cantwell* v. *Baker*,) held that to *erect*, does not necessarily imply to *build*, much less a purchase of ground for a building. He held it might mean merely an endowment. But Lord Kenyon, in *Foy* v. *Foy*, held that if there was no hospital already existing, the provision would be void. Then came the *Attorney General* v. *Nash*, (13 *Bro. C. C.* 588,) in which the words *erect and build* occurred. The former, undoubtedly, is not so strong as the other, from what Lord Hardwicke had held, that it might mean an endowment. Therefore, in that case, the word 'build' was the operative word. But Lord Thurlow held the bequest altogether void, and allowed the demurrer." The master of the rolls proceeds to say: "In this case (*Chapman* v. *Brown*) the alternative is to build or purchase. It is admitted a bequest to purchase would be void, and it is determined, by all those cases, that a bequest for the purpose *of building* a chapel is equally void. The bequest therefore falls to the ground."

It follows, therefore, that if Dr. Barthop made a bequest to his executors, as trustees, for the purpose of building a dispensary, it is the same as though he had made the bequest of money to purchase the land and erect and build thereon

the dispensary; and it seems to be the inevitable legal conclusion, that the language used in this will contemplates the erection of a building for the dispensary; and all the cases concur in the result, that such direction necessarily implies a direction to purchase land for such erection and building.

But it was earnestly urged, on the argument, that this bequest might be carried into effect by the hiring by the executors, of a building for the dispensary; and that, therefore, this presumed direction to make a purchase of land would be avoided; and that the court should make such presumption, to uphold a charity. Lord Hardwicke, in *The Attorney General* v. *Bowles*, held that such an intention might be presumed, in favor of a charity; but, as we have seen, this decision has been distinctly overruled; and Lord Bathurst, in the subsequent case of *The Attorney General* v. *Hutchinson*, said that as the testator had not himself pointed to that intention, it was not to be presumed by the court.

In the present case, if the testator had contemplated the hiring of a building, such intention should have been manifested by the will; but it clearly and conclusively appears to us, that it was both his intention and desire, that so much of his estate as was necessary, and the whole, indeed, if necessary, was to be used in the erection and establishment of a dispensary, similar to that in New York; that consultation was to be had in reference to such establishment, and that all the funds needful for its maintenance, and to carry on the building, were to be provided for and used for these purposes; and the yearly expenses of carrying out the testator's wishes in this behalf were to be taken from his estate. It is impossible to resist the conviction that it was in the mind of the testator to provide the means to erect and establish, somewhere, an institution to provide for the wants of indigent persons, both sick and lame, and to answer such provision, not only to those who might be in the dispensary, but to such also as might be at their own homes. His desire was to imitate the charitable institutions of his native land, and

which, to the honor of our countrymen, have become so numerous among us. This intention, laudable and honorable to the humane and benevolent feelings of the testator, if it has been manifested in a legal manner, and can be executed in harmony with well settled principles of law, should be carried out and sustained. If, however, we find that to carry such intention into effect, violence must be done to the language used, and well-known and long-established principles have to be overthrown, and an example be set, little in accordance with the genius and spirit of our republican institutions, we should not hesitate to say so.

We can presume nothing which the testator has not himself expressed, and looking at the language used by him, it is clear to my mind that his estate was given to his executors for the purposes above indicated. Other cases were cited on the argument, which go to show that the language used by the testator, clearly indicates that the bequest was to be expended in part, in the purchase of land. In the case of *Fry* v. *The Corporation of Gloucester*, (14 *Beavan*, 196,) it was held: "That the rule deducible from these authorities, or in other words, that the true construction of the statute of 9 Geo. 2, ch. 36, is, that a bequest is void, which tends to bring fresh lands into mortmain, and also that a bequest of money to be expended in the erection or repair of buildings is void, unless the testator *expressly* states in his will his intention that the money so bequeathed is to be expended on some land then already in mortmain."

The case of the *Attorney General* v. *Hull*, (9 *Hare*, 647,) is more nearly like the present case; there the testator using the word "establishing;" here the word used being "establishment." The will in that case contained the following provisions: "I give and bequeath to the said John Hull, the sum of £400, to be by him paid and applied toward *the establishing* a school near the Angel Inn, at Edmonton, on the system of the above mentioned British and Foreign School Society, provided a further sum can be raised in aid thereof,

if found necessary." The vice chancellor said, " he was of the opinion that, upon the true construction of the will, the school was to be established by a school-house being built. Many senses might, no doubt, be given to the word establishing. It might mean by directing a payment to be made to a schoolmaster for giving instruction ; and if this meaning could properly be ascribed to the testator, then, within the distinction taken in the *Attorney General* v. *Williams*, the bequest might be good. The first part of the language of the will, the direction to apply the legacy toward the *establishing* of a school near the Angel Inn, at Edmonton, pointed to a particular locality, and rather indicated an intention to occupy a site in the neighborhood referred to ; but upon those words alone, there might perhaps be a doubt, whether they would not admit of another meaning being attributed to the word 'establish.' The latter part of the bequest, however, removed all doubt ; 'provided a further sum can be raised in aid thereof, if found necessary.' It was clear that the testator indicated the establishment of the school, not by a succession of small payments, but by an immediate expenditure of a sum of money, which might be greater than the amount of the legacy. He thought it clear, that the intention was that land should be purchased, and a building erected for the purpose of the proposed school. The gift was therefore void, and the information must be dismissed." The present case is stronger, as indicating the intention of the testator to have land purchased and a building erected thereon, than the case just referred to. Here, at the expiration of ten years after the death of the testator, or sooner, if his executors should find they had funds sufficient for the purpose in hand, they were to proceed to the *establishment* of the dispensary. Funds sufficient for the purpose were to be in hand; consequently, he did not contemplate the support of the establishment by a succession of small payments, but by an immediate expenditure of a sufficient sum to put the establishment in operation, and sustain it, and the yearly expenses connect-

ed with it. As the discretion of the executors was entirely unlimited in respect to the location of the dispensary, and as it is manifest that the benevolent intention of the testator would be best carried out by its location in the midst of a dense, rather than a sparse population, it is apparent that a large outlay was contemplated. It was to be a monument worthy of the bountiful donor, and honorable to his memory; and it will be the duty of his executors, if they have the power, or of this court, if it has any control over them or of this fund, to see that it is expended in such locality as will make the intentions of this munificent donor most extensively known, and in such locality as to insure the greatest good to the greatest number. This construction of the will is, I conceive, confirmed by the direction " to provide funds *to carry on the building."* These words indicate a provision for a permanent building, arranging for its constant repair, and for such alterations and improvements as the exigencies of the dispensary, arising from the varied occurrence of disease, and the gradual growth of the establishment, might require. The " *yearly expenses,"* which are additionally provided for, and to which words (if we give effect, as we ought, to all the words of the bequest) a different shade of meaning must be imputed, seem rather to include the payment of the physicians and agents, and to provide for the ordinary wants of a great medical establishment.

In the case of *Longstaff* v. *Bennison,* (11 *Eng. L. and Eq. Rep.* 267,) where the testatrix gave the residue of her estate toward *establishing* a school in connection with the Baptist Chapel of North Shields for the time being, the vice chancellor says: " Now the question is whether that is void on the ground that in the execution of that trust there would be occasion for the purchase of real estate for the purposes of the school. In the *Attorney General* v. *Williams,* (2 *Cox,* 387,) there was no gift of the corpus of the fund to establish a school, but a direction to pay, out of the dividends, a sum of money to the master, and to apply the surplus in a different way;

and in the due execution of that trust there could be no appli-
cation of the dividends in buying land.  But in the case be-
fore me," he adds, " the corpus of the fund in given upon trust
to pay and apply the same toward *establishing* a school in
connection.  Now the school might be established without
buying land, but the question is, would it not be a due execu-
tion of this trust to apply this fund in buying land and build-
ing a school house ?   It clearly would be.   I do not say it is
a necessary inference, because if the existing school was suffi-
cient the money might be applied otherwise, but there being
no existing school, it would be a due performance of the trust
to buy land and build a school."   But it must be conceded,
that to carry out the intention of the testator in the present
case, it would be necessary, and in fact the executors would
be obliged, to buy lands and build the dispensary.   There can
be no doubt in my mind, such was the intent of the testator
when he framed this clause of his will.   Is such a trust for
the establishment of a dispensary authorized or permitted in
this state by the statute of uses and trusts ?   Such provisions
as are contained in this will would be clearly void in England,
*as being in contravention of the mortmain act,* as we have
seen from the cases cited; but as that act is not in force in
this state, are they in conflict with any other statute regulation
of this state ?   If they are, then equally must they be con-
demned, and they cannot be executed and carried into effect.
The statutes of this state, regulating uses and trusts, declare
that all uses and trusts except as therein authorized are abol-
ished.   A reference to them shows that they cut off all trusts
except those that are expressly authorized, and that this trust
is one not so authorized.   (1 *R. S.* 727, §§ 45, 55.)   I find this
subject so fully and conclusively treated by the learned justice
who delivered the opinion of the court in the case of *Yates* v.
*Yates,* (9 *Barb.* 324,) that it seems quite superfluous to at-
tempt to add any thing to the conclusive reasoning there
adopted.   He says : " No express trusts can any longer be
created, except those enumerated in the 55th section of that

article. In determining the question of the validity or invalidity of an express trust, we are to look to that section alone. If enumerated within its subdivisions the trust is valid, if not it is illegal and void, unless capable of execution as a power in trust, (§ 58.") The same justice says : "It is said that the statute refers to private trusts such as may be enforced in favor of individuals. But the legislature have not said so, and the courts are not to speak for them. Their language is that *all* trusts except those which are implied, and those expressly created to sell lands for the benefit of creditors, or to sell, mortgage, or lease lands for the benefit of legatees, or for the purpose of satisfying some charge thereon, or to receive the rents and profits of land, and either apply them to the use of a person, or accumulate them during minority for the use of minors, are abolished. For us to interpolate another exception into the statute, would be to legislate, and that, too, on the supposition that neither the legislators nor the revisers, while providing a new system of uses and trusts, were aware that there was such a thing as a charitable use or trust, or that the law of charities had been and was an extensive branch of equity jurisdiction ; or that knowing this they unintentionally overlooked and omitted uses and trusts of a public and charitable nature. I am not willing to do this. It were better that we should abstain from legislation. If charitable uses and trusts should be excepted from the sweeping abolition made by the revision, the legislature alone is competent to do it." To the same purport, is the eloquent and impressive language of one of the revisers, the late Mr. Justice Duer, of the superior court. In the case of *Ayres* v. *Methodist Episcopal Church,* (3 *Sand.* 371,) he says, in reference to charitable trusts : "That they are embraced within the terms of these statutory provisions, terms as explicit, as strong, and as comprehensive, as the language can furnish, it is impossible to deny, and yet we remain to be convinced that they are not just as certainly embraced within their spirit and policy. At any rate, to declare that they are not, and upon that ground to introduce an ex-

ception, which there is not the slightest evidence was ever contemplated by the revisers, or by the legislature, would seem to us, as at present advised, an unjustifiable, if not unexampled stretch of judicial power. It is said that the revisers, in their notes, make no reference or allusion to charitable uses, and it is assumed that they would not have been silent had they meant to abolish them; but it seems far more reasonable to say, that had they meant to except them from the universal terms of the enactments which they proposed, they would certainly have said so; since, had such been their intention, the necessity of a further exception, in order to prevent misconstruction, could not possibly have escaped them; on the other hand, if they meant not to except, but to include charitable uses, the explanation of their silence is easy and obvious. They may have deemed it unnecessary to speak; they may have thought that the provisions which they recommended, spoke for themselves, in a language that neither the legislature nor judges could fail to understand. The article in relation to uses and trusts, commences with this declaration, 'Uses and trusts, except as authorized in this article, are abolished,' and the addition of a note telling the legislature that all uses and trusts, not excepted, were meant to be included, would have been an idle repetition of a text, which if words have a meaning, could bear no other interpretation." I confess I am unable to withstand the force of this reasoning; and considering the source from which it emanates, it carries with it a weight of authority which is irresistible. I am at a loss to see any escape from it, and these convictions would be announced without hesitation, but for the learned opinion of the late chief judge of the court of appeals, in *Williams* v. *Williams*. The arguments advanced there are stated with great clearness, and with the usual ability of their author; but a most careful perusal of them has failed to convince me that he intended to decide at all, the question now under consideration, or that the court is not bound to adopt the language of the legislature, and follow it in its plain and natural import. I concur with Justice Strong, in his opinion in *McCaughal* v. *Ryan*, (not yet reported,)

where he says : " Statute law is unyielding ; it commands implicit obedience, and allows of no exceptions—certainly none except such as it specifies, or are plainly inferable from its terms." This appears to me to be a safer rule than to speculate as to the meaning and intention of legislators, unsupported by, and even unconnected with their language. If the latter shall have been misunderstood, an annual corrective is at hand, and can always be invoked, in a recurrence to the legislative power.

But I think the case of *Williams* v. *Williams* intended to steer clear of the question here presented, and did not intend to hold, and does not hold, that *lands* could be held on trusts other than those authorized by the article of the revised statutes in reference to uses and trusts. In that case, a bill was filed in the court of chancery, to set aside certain provisions of the will of Nathaniel Potter, of Long Island. The cause was heard before Judge Ruggles, the vice chancellor of the second circuit. He sustained the bequests and dismissed the bill. From his decree an appeal was taken which came to the general term of the second district, where it was heard by Justices Barculo, McCoun, Brown and Morse, who *unanimously* held the bequests invalid, and reversed the decree. From this judgment an appeal was taken to the court of appeals. In that court the only opinion delivered was by Mr. Justice Denio, in favor of reversing the judgment and sustaining the trusts of the will. With him concurred Mr. Justice Ruggles, who originally heard the cause as vice chancellor, Justice Morse, who had concurred in the opposite conclusion in the court below, with Justices Willard and Mason; Justices Gardiner, Johnson and Taggart, dissenting. Justice Denio, at the commencement of his opinion, says: " Both the legacies are of personal property *only*, and both are therefore unencumbered by some of the difficulties which might attend such disposition of real estate." The case of *Andrews* v. *The General Theological Seminary of the Protestant Episcopal Church*, (4 *Seld.* 559, *n.*) which was decided at the same time, and apparent-

ly upon the authority of *Williams* v. *Williams,* was also a case involving personal property, and no opinion was delivered by the court. The case of *Tucker* v. *St. Clement's Church,* (4 *Seld.* 558, *note,*) was decided at the same time with *Williams* v. *Williams,* and the judgment of the superior court affirmed. This was a case of a conveyance of real estate, and at first might seem to be in point upon the question now before us. But in truth it presented a totally different question. No opinion is given in the court of appeals, but the case is reported in the superior court, in 3 *Sand. Rep.* 242. That court expressly declined to express any opinion upon the questions whether the English law of charitable uses was in force in this state prior to the revised statutes, and if so, whether it was abrogated by the provisions concerning uses and against perpetuities, contained in those statutes. It was not necessary to decide either question, and we cannot suppose that the court of appeals, in affirming the judgment rendered in the court below, meant to do what was not needful to that judgment and was intentionally omitted by the court below. The action was brought to set aside a conveyance of lands made directly to St. Clement's Church for the support of its minister for the time being. The conveyance was sustained on the ground that the church, as a corporation, was authorized by the statute under which it was organized to take and hold lands, within a certain limit, which was not exceeded in this instance, for the purposes of the church or for certain other pious uses, and that the support of its minister was a pious use contemplated by the statute. It is to be remembered that the opinion of the superior court in this case was delivered by Mr. Justice Duer, who in the case of *Ayres* v. *Methodist Episcopal Church,* (3 *Sand. Rep.* 371,) discussed the application of the statutes of uses and trusts, and of perpetuities to trusts for pious and charitable purposes; and, as we have seen, with great force and power; and has given the weight of his authority, not only as a judge, but as one of the authors of the statutes in question, to the conclusion, that as matter of legislative

intention as well as judicial construction, these statutes do apply to trusts of this description. This decision is not, therefore, in conflict with that in the case of *Ayres* v. *Methodist Episcopal Church*, as was supposed by Mr. Justice Paige, in *Voorhees* v. *The Presbyterian Church of Amsterdam*, (8 *Barb.* 135.) This latter case is not an authority for the proposition that the revised statutes have no application to charities, as that question was not necesarily involved in the decision. It is true that Mr. Justice Paige declares such to be his opinion, but it was disapproved of by Mr. Justice Hand, when the case came up on appeal, and no dissent to his views was expressed by his associates, Justices Cady and Allen. (*See* 17 *Barb.* 103.) Such would seem to have been the uniform current of decisions in this state, holding the provisions of the revised statutes applicable to trusts for pious and charitable uses. Opposed to these are two decisions by the late Assistant Vice Chancellor Sandford—a name ever to be mentioned with respect, and to whose opinion great weight is deservedly attached. In the cases of *Kniskern* v. *Lutheran Churches*, (1 *Sandf. Ch.* 439,) and *Shotwell* v. *Mott*, (2 *id.* 46,) he held the revised statutes had no application to this class of trusts. It must be borne in mind that those cases relate to personal property only, and therefore can, in no proper sense, be referred to as authority on the question we are now considering. The vice chancellor, indeed, meets the whole question with ability and learning, and enforces the opinion with great clearness and cogency, that charities and pious uses are not within the prohibition of the statutes. In the view entertained by this court in *Williams* v. *Williams*, the justices of the second judicial district have again concurred, in the late case of *McCaughal* v. *Ryan*, not yet reported. Justice Emott says : "I think it is obvious, from the cases in the court of last resort, that no adjudication of the question now before us, has been made by that tribunal." He adds : "It would, however, be incorrect to say that upon the question we are now considering there is any conflict among the decisions,

however the opinions of judges, incidentally expressed, may disagree. In every case where the point has been presented for distinct adjudication, in the courts of this state, it has been held that the prohibitions of the revised statutes do apply to devises of lands to pious and charitable uses." In this case it was held that a devise of land to charitable and pious uses, not being authorized by the revised statutes, was null and void, and that the case of *Williams* v. *Williams* did not conflict with that opinion. Justice Strong says, "It was contended, on the argument, that the case of *Williams* v. *Williams*, decided in the court of appeals, disposes of this question." He then states that case, and adds: "The court did not decide, and as it was a bequest of personal property, they could not decide that our statute of uses and trusts does not apply to trusts for charitable or religious purposes."

We have seen, from an examination of many cases in England containing bequests similar to the one in the will under consideration, that such bequests were held void, because they could not be carried out, except by putting land in mortmain, contrary to the statute of 9 Geo. 2, ch. 36. So, in the present case, this bequest, to be effectual, imposes the necessity of creating a trust in lands, prohibited by our statute of uses and trusts, and must fall under a similar condemnation, and be held null and void. In the English cases referred to, the purpose to which the bequest was devoted being illegal, the property bequeathed went to the next of kin, and the same result follows in this case. This view of the provisions of this will is arrived at irrespective and entirely independent of the considerations urged, in reference to its being a bequest for charitable and pious uses. These considerations will be considered and discussed hereafter, in another view of the case.

Having arrived at the conclusion that the bequest to found the dispensary is void, it follows that the bequest of any possible surplus is also void, for the following reasons: The law is well settled in England, that when an undefined portion of

a fund is given to a void charity, and the residue of such fund is given for legal charitable purposes, but it cannot be ascertained how much was intended or would be required for the illegal objects, the ultimate gift will fail altogether. In the present case the testator devotes the whole residuary estate he possessed, with its accumulations, to the founding a dispensary. The overplus was given to his executors in trust, to be disposed of by them for general purposes of charity. Now this is the precise provision of the will in *Chapman* v. *Brown*, (*supra.*) There, after the bequest to build the chapel, "if any overplus should remain from the purchasing or building the same," such surplus was to go to the support of a minister, to the extent of £20 a year; and if any further overplus remained, the testatrix desired the same might be laid out in such charitable uses as her executors should think proper.

In the case referred to, Sir William Grant says: the bequest for the chapel "is entirely indefinite; it is quite uncertain what the residue would have been, and therefore it is void for that uncertainty. She (the testatrix) had no view to any residue, *but a residue to be constituted by actually building a chapel.* She contemplated no residue but with reference to that. It is impossible to ascertain it in the only manner in which she meant it to be ascertained. It is impossible for the court to apply it. Therefore the whole of this disposition is void."

I am unable to see why the case of the *Attorney General* v. *Davies*, (9 *Vesey*, 535, 543,) is not quite decisive on this point. There the testator gave "£5000, more or less, as it might be wanted, to build twelve almshouses, purchase the ground, six for poor men, six for poor women, economy and convenience observed in the structure." He then disposed of the residue of his personal estate, and added a provision for the further benefit of such charity, in case its committee should furnish grounds for the almshouses. Here the size of the building necessary for the purpose intended was sufficiently indicated, yet it was held by Sir William Grant, that

the bequest of the residue was wholly void. "It may be," he observed, "if the whole scheme might be carried into effect, that the orphan school (which is the charity mentioned) might have a benefit, for there might be a surplus, and only what is equivalent to the land is to be applied." "But," continues the master of the rolls, "it is impossible to make an apportionment and declare the bequest of the residue void for part, and good for the rest." On appeal to Lord Eldon, (9 *Vesey*, 546,) he thus described the disposition in question : "It is a bequest of a residue to be laid out in the first instance in lands, and if all should not be exhausted, as it could not be, consistently with his scheme, to be laid out upon these purposes, affording medical assistance, and for a chaplain in the almshouses, and all beyond that, if well given, is uncertainly given ; and if the primary gift fails, the secondary gift, being totally uncertain and fluctuating *from time to time*, the whole must fail." *Chapman* v. *Brown* is quoted approvingly by Sir Thomas Plumer, V. C., in *Attorney General* v. *Hinxman*, (2 *Jac. & W.* 270,) where the master of the rolls held " that when the first gift is to a void charity, and the quantity is undefined, the bequest of the residue falls." The facts and circumstances which formed the foundation of *Attorney General* v. *Davies*, and *Attorney General* v. *Hinxman*, met together in a subsequent case before Sir John Leach, V. C. A sum of £7000 stock was bequeathed upon trust, among other things, to pay the expense of buiding eight almshouses (the number of inhabitants appearing to have been fixed by the testator,) and a further sum of £8000 stock was to be applied, among other ways, in paying for all repairs and charges of the almshouses, the residue of both sums being given for a valid charitable use. The court following the two former decisions, held here that this bequest of the residue was void, *because it was incapable of being ascertained except by the actual execution of the prior purposes.* (*Limby* v. *Garr*, 6 *Madd.* 151. *See also the recent case of Cheney* v. *Mott*, 1 *Myl. & Craig*, 133, 134.) Applying these prin-

ciples to the present case, we see it is equally impossible to ascertain the residue, to go in trust for general charity, even upon the execution of the prior purposes; because nothing goes until the dispensary is established, and after the expenses of carrying on the building, and the yearly expenses of the establishment, and of attending to indigent persons both sick and lame, at the dispensary and at their own homes, are met and paid. What these yearly expenses may be cannot now be ascertained. They must be ever varying and dependent on the extent of the testator's bounty, and the number of its recipients. It is, therefore, utterly impossible to ascertain the residue bequeathed, except by the actual execution of the prior purposes, and as they cannot be carried out, therefore, upon well established principles, and these express adjudications, such bequest of any residue is void. (*See also Shelf. on Mortm.* 200, 203 ; *Att'y Gen.* v. *Hinxman,* 2 *Jac. & W.* 270, 277, 278, *and so much as is cited from Att'y Gen.* v. *Davies; Sumner's notes to Moggridge* v. *Thackwell,* 1 *Ves. jun,* 464, 475, *note a;* 2 *Williams on Ex.* 921.) Nor does the fund which it directed to be applied to the establishment of a dispensary, fall into the residue devoted to general charity. Several cases are cited below where a devise was held void because the devisee was incompetent to take, and yet, though the devise was void from the beginning, the heir was preferred to the residuary devisee, on the ground that the testator never intended that the specific devise, which was void, should fall into the residuum. (*Green* v. *Dennis,* 6 *Conn.* 292. *Layan* v. *Carwell,* 3 *Har. & McHen.* 383. 6 *Paige,* 600. *S. C.* 20 *Wend.* 457. *James* v. *James,* 4 *Paige,* 114. *Van Cortlandt* v. *Kip,* 1 *Hill,* 590. 15 *Conn.* 297, 298.) And again, this fund itself was part of a residue, and a residue never includes what has been once bequeathed as a residue, but of which the gift falls. (*Ward on Leg.* 32. *Floyd* v. *Barker,* 1 *Paige,* 480, 482. 1 *Swanst.* 565, 570. *Cheslyn* v. *Cresswell,* 2 *Eden,* 123.) It seems clear, on the authorities, that a part of the residue of which the disposition fails will not accrue in augmentation of the remaining parts as a residue, but instead of resuming the nature of a residue,

devolves as undisposed of. Residue means all of which no effectual disposition is made by the will; but where the disposition of the residue itself fails, to the extent to which it fails, the will is inoperative. (1 *Swanst.* 565, 570.) Chancellor Walworth says, in *Floyd* v. *Barker, supra:* "But if the residue is given to several in common, and one of them dies, or the bequest is revoked as to one, his share goes to the next of kin."

Looking, therefore, at the intention of the testator, it is quite clear that the first and great object in his mind was the establishment and continuance in perpetuity of the dispensary; that he intended to devote the whole or so much of the residue of his estate to that object, and if any overplus remained that was given to his executors to be devoted to the general purpose of charity. It is apparent to my mind, that he never intended that the whole of his estate should thus go to his executors for general charity, but he manifestly supposed that a small fragment would remain for that purpose. It would, therefore, be a clear and palpable violation of such intent to hold that the bequest for the dispensary failing, the great bulk of the estate shall go to general charity. Such was not the will of the testator, and we have no power, much less disposition, to make a will for him.

If the positions heretofore assumed are sound, it follows that the bequest for the dispensary being void, this bequest of a possible residue must also fall. That from which it was to be taken, is indefinite, uncertain, and fails. No one can say what was to be taken, and therefore it cannot be ascertained what remains. The executors cannot take for general charity what was intended for the dispensary. Such is not the will of the testator. If it could be included, then the bequest of the surplus, in *Chapman* v. *Brown,* instead of falling, should have been not only sustained, but it should have been held to have swallowed up the lapsed portion of the residue intended for the chapel. That would have been making a will for the testatrix, instead of construing the one

made by her. In the present case, as the bequest for the dispensary fails, it follows that the bequest of the overplus to the executors remaining after satisfying that bequest, also fails. These considerations are decisive of this case, and it would be disposed of if we stopped here. But other views were presented and urged on the argument, which should be considered, though not deemed essential to the disposition of the case.

We will then consider next, if this bequest for the establishment of the dispensary, can be sustained on the ground that it is a bequest for a charitable and pious use. And this opens up a wide field for discussion and inquiry. I do not propose to follow, minutely, the learned discussions which have been had upon this branch of the law. I intend only to refer to such principles as seem to me well settled, and which to my mind afford a solution to the points presented in this case:

*First.* I regard it as now settled in this state, that the extent of the jurisdiction of this court over trusts for charitable and pious uses is none other than that possessed by the court of chancery of England over trusts in general. (*Per Selden, J., Owens* v. *Missionary Society,* 14 *N. Y. Rep.* or 4 *Kern.* 380.) The jurisdiction of the court of chancery in England, in relation to charities, was derived from three sources: 1. From its ordinary jurisdiction over trusts. 2. From the prerogative of the crown. 3. From the statute of 43 Eliz. ch. 4. In the opinion referred to, *supra,* Selden, justice, says: "It has never been seriously contended that the courts of this state possessed that portion of the jurisdiction which was derived from the statute of Elizabeth. This statute was embraced in the general repeal of English statutes in 1788, and there is not the slightest evidence that it had been previously adopted so as to become a part of the common law of the state. It is clear, therefore, that so far as the law of charitable uses was derived from, and depended upon the statute of 43 Eliz. it was not in force here, and it seems

equally clear that our courts are not endowed with any portion of the power which the Chancellor of England exercises by virtue of the royal prerogative, and as the personal representative of the crown. It follows that the jurisdiction possessed by the courts of this state, over trusts for charitable purposes, is limited to that which the court of chancery in England possessed, independent of these two sources. This is the view which seems to have been taken of the subject by this court, in the case of *Williams* v. *Williams*, (4 *Seld.* 525.) The power of the court of chancery in England almost uniformly exerted in reference to charities, is that which is familiarly known as the *cy pres power.* Boyle, on Charities, at page 147, says, if charity be the general, substantial intention, though the mode by which it is to be executed fails, through accident or other circumstances, the court will find some means of effectuating that general intention; and this is done by resorting to the principle of *cy pres*, which the courts do, being guided by a supposed discovery of intention on the part of the donor to devote the subject of his gift, at all events, to charity, and to deprive his representatives of every claim to the property. Thus, he says, it is well established, when the donor has left the selection of objects as in some cases, of the mode as in others, and of the charities themselves, as in a third class of cases, to individuals who afterwards became incapable of executing the office confided to them, the court will take upon itself to act in their stead; citing Lord Eldon, *Moggridge* v. *Thackwell*, (7 *Ves.* 78.) Boyle also says that these cases carry the doctrine considerably beyond what is allowed when private interests only are concerned, and that they, to some extent, have to draw their support from the statute of 43 Eliz. In 1 *Jarman on Wills, p.* 216, it is said, "Thus, in the case of a gift to the poor in general, (*Attorney General* v. *Matthews,* 2 *Lev.* 127; *S. C. Nom. Price* v. *Peacock, Finch,* 245; *Attorney General* v. *Rance, Cit. Amb.* 422;) as to charitable uses generally, (*Clifford* v. *Francis,* 2 *Freem. Ch. Cas.* 330; *Attorney General* v. *Herrick,*

*Amb.* 712;) or for the advancement of religion, (*Boyle on Ch. b.* 2, *ch.* 3, *p.* 147, *and seq.;*) in the most vague and indefinite terms, (*Powerscourt* v. *Powerscourt,* 1 *Mol.* 616;) or to such charitable uses as the testator's executors shall appoint, and the testator revokes the appointment of the executors, (*White* v. *White,* 1 *Bro. C. C.* 12;) or to such charitable uses as A. shall appoint, and A. died in the lifetime of the testator; (*Moggridge* v. *Thackwell,* 1 *Ves. jun.* 464; 3 *Bro. C. C.* 517; 7 *Ves.* 36; *Mills* v. *Farmer,* 1 *Mer.* 55; 19 *Ves.* 483;) or neglects or refuses to appoint, (*Attorney General* v. *Syderfin,* 1 *Vern.* 234; *S. C.* 7 *Ves.* 43, *note;*) or to such charitable uses as the testator himself shall appoint, and he dies without making an appointment, (*Freeman's Ch. Cas.* 261; *Mills* v. *Farmer,* 1 *Mer.* 55;) or when the testator makes a disposition in favor of an object which has no existence, (*Attorney General* v. *City of London,* 3 *Bro. C. C.* 171;) or which is void in law, (*Attorney General* v. *Whorwood,* 1 *Ves. sen.* 534; *De Costa* v. *Depaz, Amb.* 228; 2 *Ves. sen.* 376; 2 *Swans.* 487; *Cary* v. *Abbott,* 7 *Ves.* 490;) or has become impossible, (*Attorney General* v. *Guise,* 2 *Vern.* 266;) or bequeaths to the trustees of a charity, who refuse to accept, (*Attorney General* v. *Andrew,* 3 *Ves.* 633;) or to a particular charity, by a description equally applicable to more than one, and it is wholly uncertain which was intended," (*Simon* v. *Barber,* 5 *Russ.* 112.) "In these, and in all such cases," says Jarman, "though the bequest would, upon the ordinary principles which govern the construction of testamentary dispositions be void for uncertainty, yet the purpose being charity, the crown, as *parens patriœ,* or the court of chancery will execute it *cy pres.*" The cases of *De Costa* v. *Depaz, Isaacs* v. *Gomports,* and *Carey* v. *Abbott,* may be mentioned as illustrative of the exercise of the power of the crown in making disposition of the property by sign manual. In the latter case it was held that a residuary bequest, for the purpose of educating and bringing up poor children in the Roman Catholic faith, was void, and that the fund did not

go to the next of kin, but was in the disposition of the crown, as *parens patriæ*, to some other charitable use, by sign manual. It is unnecessary to say that no such power as that exercised in those cases exists in this country; and any attempt at its exercise would meet the just execration of a free people, whose boast it is to tolerate alike all religions, and permit every man to worship God according to his own conscience. These last cases are almost equally objectionable as examples of the tyrannical exercise of absolute power.

The case of *Moggridge* v. *Thackwell* is the leading case of the exercise, by the court of chancery, of the *cy pres* power. This case was first heard by Lord Thurlow, and came on for hearing on the scheme proposed, before Lord Rosslyn, who was so little satisfied with the decision, that he intimated that it ought to be re-heard. It was accordingly re-heard before Ld. Eldon, who rather thought the decree right. His opinion, while it shows the difficulties of the subject, and, as I think, the extravagance of the *cy pres* doctrine, is interesting also as displaying the peculiarities of that cautious, subtle, and remarkable reasoner. "He had conversed," he says, "with many persons on it, and had great difficulty in his own mind, and had found great difficulty in the mind of every person he had consulted, but he deduced from the cases the principle, that when there is a general indefinite purpose of charity, not fixing itself upon any object, as that in a degree did, the disposition was in the king by sign manual; but where the execution was to be by a trustee, with general or some objects pointed out, the court would take the administration of the trusts. But when authority met authority, and precedent clashed with precedent, he doubted whether he could make a decree more satisfactory to his own mind, than that which had been made. He felt himself, however, relieved by his action in the case, and from the anxiety he felt in disappointing the natural expectations of those entitled to the estate, by the reflection that if he did not act, it would be the duty of the advisers of the crown to attend to this particular object, and

that the same result would be produced in depriving the next of kin of the estate." He added, " that whether this court executed the charity, or the king by sign manual executed it, the constitution finds a trustee in the court or the king, to act in the one case as the court would act; and, considering the king *parens patriæ,* as one who would act exercising a discretion with reference to the intention, there would not be, as there ought not, any difference in the execution." It is very apparent that Lord Eldon was little satisfied with this decision at the time he made it, and his remark in *Mills* v. *Farmer,* (19 *Vesey,* 483,) is not surprising, that he never pronounced a judgment so much in opposition to his own individual opinion, and that, as he said in *Moggridge* v. *Thackwell,* he let it stand merely because Lord Thurlow had made it before him. This case is cited and relied on mainly, by the learned counsel for the people, as an authority for the position that a court of equity in the exercise of its ordinary jurisdiction will enforce a valid charity, when the charitable intent is clear, and to show that the charity was upheld in the exercise of the ordinary jurisdiction of a court of equity. We have already seen, that the learned author on wills, cites it as one instance of the exercise of the *cy°pres* power, and a strict examination of the case shows it was an application of the *cy pres* doctrine, and that only; and the case is greatly misapprehended, when quoted as an authority for the exercise, by a court of equity, of its ordinary jurisdiction over trusts. The facts are, that Ann Cam, by her will, dated 16th June, 1779, after making many dispositions of what appears to be a very large estate, and giving a large number of legacies, gave all the rest and residue of her estate unto James Vaston, "desiring him to dispose of the same in such charities as he should think fit, recommending poor clergymen who have large families, and good characters." The residue of the personal estate amounted to £50,000, and was claimed by the next of kin. *Vaston died before* the testatrix, and his death was known to her. The decree as pronounced by Lord Thurlow, declared, that the residue of the testatrix's personal estate passed by her

will and ought to be applied in charity, regard being had to poor clergymen with good characters and large families, according to the recommendation of the will; and he referred it to a master to approve of a scheme to effectuate the purposes of said charity, with liberty to the parties to lay proposals before him for that purpose. It cannot escape notice that a similar reference has been made in the present case, and for a like purpose; and apparently the case cited was regarded as a precedent for such a proceeding. But it will be seen, that the master and the court, in the English case, quite overlooked the poor clergymen with good characters and large families, the objects of the testatrix's bounty and thoughtful care. The scheme adopted by the master, and sent to the court for approval, proposed that the defendant Walker, first cousin and heir at law of the testatrix, *ex parte materna*, might be allowed, out of said residue of the personal estate given to the poor clergymen with good characters and large families, £5000, under the peculiar circumstances of his case. That small annuities should be granted to several other persons, who were either relatives of the testatrix, or were in life dependent on her bounty. That a school should be established at Dymocke, the residence of the testatrix and her family, for poor children of that parish. That £1000 be appropriated in aid of the Gloucester infirmary; £1000 in aid of an *intended* lunatic asylum at Gloucester; that £6000 be transferred to the society in the diocese of Gloucester, instituted for relief of widows and orphans, and the dividends applied for the relief of poor clergymen who have large families and good characters, and the residue and remainder of said personal estate was to be invested, and the dividends applied to the relief of poor clergymen with good characters and large families, according to the recommendation of the will. How much of this fund was taken to provide the annuities, and to establish the school at Dymocke, does not appear from the case, but if half of the £50,000 was ultimately invested for the poor clergymen with good characters and large families, it is quite as much as the

facts before us would warrant us in believing. The case appears to have been argued with distinguished ability and profound and extensive research. The numerous cases cited show the importance and interest attached to the discussion. In support of the decree it was stated by the counsel that the only question of reasonable doubt was, whether the disposition was to be in that court *by a scheme,* or by the crown at once without that form. It was said that it is difficult to ascertain precisely the ground of distinction. From all the early cases, it was said, it is clear that when the bequest is indefinite and uncertain in its object—a general bequest for charity—it would be for the crown to dispose of it. So it is also when it is clearly a disposition to charity, but to be carried into execution in a way the law will not allow, as in *De Costa* v. *De Paz;* there also the disposition is in the crown; upon the principle that the distinct object failing, nothing remains but the general object of charity. The distinction seems to be that when the party has pointed out any particular object defined in any degree, then it is looked on as being in the disposition of the crown, which might overlook the intention completely, and appoint arbitrarily. Therefore when any particular object has been pointed out, the court has considered it for its own disposition, in order to secure as far as possible the attainment of that object. So when the object is legal, but from circumstances it is impossible that it can be executed, then the court takes it with the same view, to carry it into effect upon some scheme as near as possible to the disposition intended. The court acting would not, it was said, disregard the recommendation of the testatrix; but the crown would not be bound by it. The distinction is certainly faint, but it seems to be this: when the object is clearly general and uncertain, the crown is to have the disposition; when the object is pointed out and is legal, but cannot take effect, the court would apply it *as near as may be.* These arguments and considerations, thus urged by the learned solicitor general, and Mr. Finch, counsel for the plaintiff, mainly influenced the lord

chancellor, and formed the basis of his judgment. The scheme formed by the master and approved by him, had but little reference to the benevolent intentions of the testatrix, and it is not seen how the crown, if the disposition of this estate had been left to it, could have overlooked the intention of the testatrix more completely or have appointed more arbitrarily. I feel no hesitation in saying that this case is no authority for the exercise of the ordinary jurisdiction of a court of equity over trusts, but is an exercise of the *cy pres* power, which forms no part of the powers of this court, and the assumption of which would be as offensive to public sentiment, as would be an attempt to exercise that of the sign manual. It is clear to me that this trust for the dispensary, if created in England could be set in motion by virtue of the *cy pres* power only. All the cases, I think, conclusively show it. *First.* No amount is prescribed to be appropriated for that purpose. *Secondly,* no plan is arranged for it. *Thirdly,* no location is fixed on. *Fourthly,* the executors named to whom the discretion was confided to arrange a plan, means and location, have resigned and refused to accept the trust.

In these, and like cases, as we have seen by the cases heretofore cited, the execution of the general purpose of charity devolves on the crown, as *parens patriæ,* or on the court of chancery to execute it *cy pres;* in this case a particular object being pointed out, its execution would, in England, be undertaken by the court of chancery, in the exercise of the peculiar powers alluded to. Here, it seems proper to remark, that I have looked in vain for any thing in the will, indicating therein an intention on the part of the testator, that the dispensary should be located at Kinderhook. On the contrary, there seems to me to be many cogent and conclusive reasons why he did not contemplate its location there. They have already been suggested, and it is only necessary now to say that nothing can be found in the will, or is deducible from it, which, in my opinion, indicates Kinderhook as the place of its location. It must be determined, if determined at all,

*cy pres,* as was done in *Moggridge* v. *Thackwell.* It seems to me, as it did on the argument, that the circumstance that the learned and experienced judge who heard this case at special term, found it necessary to have a scheme framed before this trust could be executed, settles the whole question, and conclusively shows that this court, in attempting to carry out the will, is exercising the *cy pres* power. And here it may be well to inquire what is the meaning of the term, execution of a will *cy pres?* The duty of a court in the interpretation of a will, or the construction of a clause creating a trust, is precise, and consists in the ascertainment of the meaning of the instrument by the application of the rules of law, and the principles of interpretation. While confined within the limits of fairly ascertaining the meaning of the testator or donor, from the expressions of the instrument, or by inferences legitimately deduced therefrom, with the aid of judicial reasoning, and the established rules of verbal interpretation, the court is discharging the duties of a legal tribunal. When it goes beyond those limits, it enters into the region of unlimited and dangerous discretion, and there the doctrine of *cy pres* begins. It is following Lord Thurlow, in *Moggridge* v. *Thackwell, in quatuor pedibus;* and that case, equally with this, is an exercise of the *cy pres* power. It becomes now necessary to inquire whether any such power can rightfully be exercised by a court of equity in this state. It would seem to be well settled that this *cy pres* power can neither be exercised by the courts of this state, nor by the federal courts. (*Owens* v. *Missionary Society, supra, court of Appeals. Fontain* v. *Ravenel,* 17 *How.* 269, 385, 6.) It may on this point be proper to refer again to *Williams* v. *Williams,* (4 *Seld.* 525,) though that case did not raise any question under the *cy pres* power. But Denio, J., in delivering the opinion of the court, in an obiter portion of it, twice concedes (*pp.* 548, 550) that our courts cannot exercise the *cy pres* power. And such appears to have been the current of decisions in this state. (*Yates* v. *Yates,* 9 *Barb.* 324.

*Ayres* v. *M. E. Church,* 3 *Sandf.* 351. *King* v. *Rundle,* 15 *Barb.* 139, 151.) Such seem to have been the decisions of our sister states. (*McAuley* v. *Wilson,* 1 *Dev. Eq.* 276. *Wit-man* v. *Lex,* 17 *S. & R.* 88. *Atty. Genl.* v. *Jollery,* 2 *Shot. Eq.* 379, *Dickson* v. *Montgomery,* 1 *Swanst.* 348. *Gallego* v. *Atty. Genl.* 3 *Leigh,* 450.) In the case under considera- tion, discretionary power was vested in the testator's execu- tors, in reference to the dispensary, the amount of funds, time of erection, location and general plan of the establish- ment. This certainly can only be regarded in the light of personal confidence reposed in them. Now it would seem to be free from doubt, that by the death or renunciation of ex- ecutors clothed with a discretionary power of this kind, such power becomes extinct. (*Dominick* v. *Michael,* 4 *Sandf.* 374, 401. *Cole* v. *Wade,* 16 *Vesey,* 29. *Atty. Genl.* v. *Andrew,* 3 *id.* 633. 2 *Sug. on Powers,* 191. *Keates* v. *Burton,* 14 *Vesey,* 434.) After this renunciation, and the appointment of an administrator with the will annexed, the executors can- not prove the will. (*Robertson* v. *McGeoch,* 11 *Paige,* 640. *Keates* v. *Burton,* 14 *Vesey,* 434.) But the court at special term seems to have supposed that 2 *R. S.* 72, § 22, gives the administrator with the will annexed the same rights to exercise this discretionary power that the executors would have had. The contrary of this has been expressly held, one of the revisers delivering the opinion of the court. (*Dominick* v. *Michael,* 4 *Sandf.* 374, 402, 407.) The court there holds that section 22 is a mere re-enactment of the previous stat- utes, and that none of them had affected the rule of the com- mon law. It certainly cannot be maintained that the legisla- ture intended to devolve on the administrator with the will annexed, any other powers than those which survived on the death or renunciation of the executor, and which remained to be discharged. Personal confidence could not be so trans- ferred, and it is quite unsound to suppose that the legislature intended to revive in the administrator with the will annexed, powers merely discretionary, and the execution of which in-

volved personal confidence and trust. The executors or trustees in whom this confidence was reposed having refused to accept, the court in England, on the authority of *Attorney General* v. *Andrew*, (*supra*,) would proceed to execute the trust *cy pres*, or send it to the king to be executed by the sign manual. As neither of these powers can be exercised in this state, it follows that the testator, as to the property so disposed of, died intestate, and the same goes to the next of kin. The authority to maintain this seems to me to be conclusive.

Take the case of *Owens* v. *Missionary Society.* If our courts exercised the *cy pres* power, then, for whatever cause, the bequest in that case to the unincorporated society failed, yet the object of the bequest being clearly charity, the court should have gone on *cy pres*, by a scheme, and disposed of the fund in favor of some other kindred charitable object, instead of holding the testator to have died intestate in this behalf, and the bequest to have gone to the next of kin. (*Hayter* v. *Trego*, 5 *Russ.* 113. *Lorcomb* v. *Wintringham*, 13 *Beav.* 87.) That the testator so died intestate as to this surplus of his estate, and that nothing short of the assumption by this court of the *cy pres* power, and which, if I am not under an entire misapprehension, has been assumed in the decree appealed from, can now execute this will as to this fund, is to my mind clearly demonstrated by Judge McLean in his opinion in *Fontain* v. *Ravenel* (*supra.*) In that case the executors were all dead (in this they are as it were *civiliter mortui,*) and the gift was for general charity, at the discretion of the executors. He admitted that the executors, had they been alive, might have executed the trusts, but as they were dead, he says, at page 386: "The testator was unwilling to give this discretion to select the objects of his bounty except to his executors. He relied on their discrimination, their judgment, their integrity and fitness to carry out so delicate and important a power. He made no provision for a failure in this respect by his executors * * * They died [in this case they refused to

accept the trust.] * * * And now what remains of this bequest on which a court of chancery can act? There must be some creative energy to give embodiment to an intention which was never perfected. Nothing short of the *prerogative power*, it would seem, can reach this case. There is not only uncertainty in the beneficiaries of this charity, but behind them is a more formidable objection—*there is no expressed will of the testator.* He intended to speak through his executors or the survivors of them, but by the act of Providence that has become impossible. It is, then, as though he had not spoken. Can any power now speak for him, except the *parens patriæ?"* And again, on the same page he says, "It is agreed that in England the chancellor, in administering charities, acts as the delegate of the crown, inasmuch as he discharges all his judicial functions in that capacity. If by this it is intended to assert that the chancellor in affixing the sign manual of the king, or when he acts under the *cy pres power*, is in the discharge of his ordinary chancery powers, it does not command our assent." As has been before suggested, it is immaterial to inquire whether, in this case, the charity would be established in England, by the chancellor sending it to the king to dispose of it by sign manual, or would himself undertake to execute it under the *cy pres* power, by a reference to a master to frame a scheme. Either mode of procedure, it is believed, has been shown by conclusive authority, to be wholly inapplicable to this country, and not within the power of this court. (*Boyle on Charities*, 148, 218, 220. *Fontain* v. *Ravenel*, 17 *How.* 369, 386. *Owens* v. *Missionary Soc., supra. Moggridge* v. *Thackwell*, 7 *Ves.* 36.) In either case it is the *parens patriæ* or the *cy pres* power, and not the ordinary jurisdiction of the court, which is invoked to make a will for the party, and oftentimes entirely variant from that made by the testator. (*Id.*) The king acts by his constitutional advisers, the chancellor and the attorney general; whether the charity is disposed of by sign manual or a scheme framed by a master, the attorney general suggests the objects.

(*Boyle on Charities*, 240. *Moggridge* v. *Thackwell, supra.*
*Counsel in that case arguendo.*) The attorney general, as
representing the crown, is a necessary party in all such cases.
And if he consents to any particular disposition of the fund,
or makes an arrangement with the parties claiming it, whereby
a portion is surrendered to charity, it is an ordinary thing for
the court to adopt the same without sending either to the
king for the sign manual or to a master to frame a scheme.
(*Hill on Trustees*, 462, *note* 2, *2d Am. ed. Attorney General* v. *Mansfield*, 14 *Sim.* 601. *Same* v. *Exeter*, 2 *Russell*,
370. *Same* v. *Brettingham*, 3 *Beav.* 91.) In *Attorney
General* v. *Exeter*, (*supra*,) Lord Eldon made a reference to
the attorney general, and on his report coming in, it was adopted
and confirmed by the court.    (*See also Att'y Gen'l* v. *Wilson,*
16 *Sim.* 210 ; *Att'y Gen.* v. *Worcester*, 9 *Hare*, 328, 361.) The
suit is regarded as that of the attorney general representing
the crown, and if he desires the information to be dismissed,
the court dismisses it; and it is for him to determine in all
cases whether he will proceed with it at all, and if so in what
manner. (*Att'y Gen.* v. *Iron Manufac'g Co.*, 2 *Beav.* 313,
329.) As before remarked, all compromises made by the at-
torney general with the next of kin, are approved of and adopt-
ed by the court. (*Atty Gen.* v. *Andrew*, 3 *Ves.* 633. *Andrew*
v. *Merch. Taylors' Co.* 7 *Ves.* 223.) These cases have refer-
ence to the same charity which was carried from Cambridge
to Oxford *cy pres*, and an arrangement was made with the
residuary legatee by which he should have a certain portion
of the funds given in charity. The court made the decree ac-
cordingly, on the consent of the attorney general, giving only
about one-third of the fund to charity, and the other two-
thirds to the residuary legatee and next of kin. (*See also
Attorney General* v. *Bishop of Oxford*, 1 *Bro. Ch. C.* 444, *n.;
Wheatley Church, Boyle on Charities*, 150.) Lord Eldon in
*Moggridge* v. *Thackwell*, hints at a distinction between the
cases where the king's sign manual is obtained, and where it
is sent to a master for a scheme. It would seem to be that the

former is resorted to when there is no object of charity indicated, but a general intent to give in charity; but when the execution is to be by a trustee, with general or some objects pointed out, then the court will take the administration of the trust. But this rule is not uniform, as he shows. The distinction is a mere matter of practice, and is a rule which is infringed upon by the court in England daily. The cases cited by Lord Eldon show this, and the following cases decided since his time equally show it: (*Denyer* v. *Druce, cited,* 3 *Hare,* 191–4, *n. a. Att'y Gen.* v. *Londonderry, cited* 3 *Hare,* 191–4, *n.* 2 *Shelf. on Mort.* 273, *S. C. Felon* v. *Russell,* 4 *Irish Eq. Rep.* 701. *Att'y Gen.* v. *Fletcher,* 5 *Law J. N. S. ch.* 75. 2 *Shelf. on Mort.* 537, *S. C.*) In each of these cases there was a trustee appointed by the testator, and yet the disposition was by the sign manual. And Lord Eldon, in *Paice* v. *Canterbury,* (14 *Ves.* 372,) held as he did in *Moggridge* v. *Thackwell,* that in such a case the disposition was to be by a scheme before a master. But when the king prepares the scheme or plan of the charity by sign manual, it rarely goes beyond the mere naming of the object. If any thing further is necessary to the scheme (as a quasi charter,) it goes back to the master to prepare the same, as was done in the *Attorney General* v. *Syderfin,* (1 *Vern.* 224.) It would seem, therefore, that the distinction taken in these *cy pres* cases, between those where a trustee of the fund is named by the testator, and where there is not, is ideal, and not uniform or established. In every such case (that is, in the *cy pres* class of cases above referred to,) where the testator has substituted the discretion of a third person for his own will, as to the disposal of the fund in charity, the moment this discretion becomes extinct, the testator as to this extent becomes intestate, as before shown. The property therefore vests at once in the heir or next of kin. (*Fontain* v. *Ravenel, supra.*) That in every such case the testator in fact is intestate, and the property is vested in the heir or next of kin, the ablest English chancellors have conceded, and that it is only by the

exercise of the arbitrary power by the sign manual, or by a scheme to be framed by a master, that they have been deprived of their estates and the same taken for charity; yet we have seen, that so seriously has the injustice of this procedure pressed upon those who have thus declared the law, and administered this system, that provision has often been made for the next of kin, by allowing them to retain in some cases one-third of the fund, held to be given in charity. Either the whole was given or none, and no severer commentary on this system could be urged than the gross inconsistency thus manifested in its administration. It is but a few years since the ablest of the English chancellors doubted if this system, so full of absurdities, contradictions and injustice, had really been fastened upon their jurisprudence. Lord Thurlow, in the great case of *Moggridge* v. *Thackwell,* so often referred to, held himself bound by precedent to make the decree which he did. But Lord Roslyn (late Lord Loughborough) when the cause was brought on before him for further directions upon the master's report, ordered it to be reheard, observing what was eminently true, that to carry out that scheme, and make it a decree, would be "making, not construing a will." (7 *Ves.* 36, 49. *Counsel arguendo.*) When the case came on for rehearing, before Lord Eldon, (7 *Ves.* 36,) he avowed that he was shocked at the doctrine, (*Id.* 68, 87;) and that to affirm that decree, was in fact arbitrarily making a will for the testatrix, (*Id.* 68, 83, 87,) and *divesting* the next of kin of a fund now *vested* in them. He said it was a "surprise upon the testatrix," (*Id.* 68;) and that he had for the past ten years believed that in the event which had happened, the testatrix, as to the fund in question, had died intestate. (*Id.* 83, 87.) It should be borne in mind that for seven years of this period he had himself been attorney general, and had doubtless become familiar with this case, and the rights of the crown, if any, to interfere with the fund in question; yet, out of respect to Lord Thurlow, and what seemed to him to be the weight of authority, he was

"reluctanly driven" to confirm the decree. He observed, "whatever the house of lords may think proper to do upon a review of these cases, it is much fitter, if they are to be departed from, that they should be departed from by the authority in the last resort, than by an individual judge sitting here;" and, at the conclusion, he adds: "If this strange doctrine, as I should have called it, if I had sat here two centuries ago, that you can find a charitable purpose in a purpose that is to fail altogether, can be shaken, I can do no more than to allow them to go to a higher tribunal." But so little was he satisfied with this decision, that more than twelve years after (A. D. 1815,) in *Mills* v. *Farmer*, (19 *Ves.* 483–6,) before referred to, he says in reference to this decision that it was "a case, that bound by precedent, I decided as much against my inclination as any act of my judicial life."

Notwithstanding all this, courts in New York are called upon to sustain this strange doctrine, to make wills, not to construe them; to adopt as a rule of law here, and as a controlling precedent, a decision which the learned chancellor who made it was reluctantly driven to make; to affirm and approve a case so full of injustice, inconsistency, and acknowledged wrong. Such principles, thus enunciated, and upon such considerations, do not commend themselves to my mind, or carry with them, any authority, how great soever, and how learned may be the source from which they emanate. They have been repudiated by the highest court known in our land, and it is there stated that it is not known that they have been recognized anywhere in this country. (*See Fontain* v. *Ravenel*, *supra, p.* 387, 8.) I have been unable to find any sanction given to them by any court in this state.

It follows, we think, from these considerations, that this court can derive no aid or authority for its action in this case, from the cases cited, and numerous others in England, where the charity has been executed by sign manual, or by the court carrying out the doctrine of the *cy pres* execution of testamentary bequests.

The executors in this case, to whom the trusts in reference to the dispensary were confided, having renounced, the trust fails for the reasons and considerations suggested, and, as this court cannot exercise the power of *cy pres* execution, and frame a scheme to carry out a radically imperfect and indefinite execution, it consequently follows, as to such portion of the estate of the testator as is involved in such disposition, that he died intestate. It follows further, that such portions did not fall into the residue of his estate, as has already been attempted to be shown, and that they did not pass by the disposition of the overplus, on the supposition that such disposition was legal and can be upheld, has already, it is believed, been established.

We come now to consider the last disposition made by the testator, in his codicil of October 13, 1838. By this codicil, he bequeaths to his executors in trust, all the residue of his estate, to pay and apply the same in such sums, and at such time and times, as they shall think fit, to one or more societies, for the support of indigent respectable persons, "hereby intending to give to my executors full discretionary power as to the disposition of the same, but so that the same shall be applied to objects of charity." If this be a general indefinite charitable purpose, as it seems to me it is, without fixing itself on any particular object, the disposition in England would be by the king by the sign manual; and no such power existing here, it is void, and the estate goes to the next of kin. But if it be a gift to trustees with general or some object pointed out, then in England, upon the distinction asserted by Lord Eldon, that the discretion as to objects being left to the executors, and they having refused to accept, the court will act, it would be executed by the exercise of the *cy pres power*, by the framing of a scheme for the charity. If it has been shown that no such power is vested in this court, then it equally follows that as to this bequest the testator died intestate, and the estate goes to the next of kin. In this view, this case is not unlike that of *Moggridge* v. *Thackwell*, the

estate there being given to Vaston, the trustee having nearly the same discretionary power as the executors in this case. Vaston having died, it was held a case for the exercise of the *cy pres* power, and the charitable intent was thus, in part, executed. Here the trustees, in whom this discretionary power was reposed, have renounced their trust, and if we had the same powers as the court of chancery of England, we could follow in its footsteps. But this case is even more like that of *Attorney General* v. *Andrew,* (3 *Vesey,* 633,) where the trustees of the charity refused to accept, and that was held to be a case for the exercise of the *cy pres* power. It was the will of this testator that the persons named by him should be the almoners of his bounty. They have refused to accept that trust. His will, therefore, fails. It is as though he had made none, and I think it clear, from authority, and it is certainly sound in principle, that this court has no right or power to make a will for him, by means of a scheme, or by any other process or machinery. *Quod voluit non dixit.* The reasoning in *Fontain* v. *Ravenel* is to my mind conclusive on this point.

But it was contended on the argument that we were to regard these as bequests to the societies indicated, for charitable purposes, and therefore we should decree payment to them. In this view these difficulties present themselves :

*First.* Taking the whole clause together, as before remarked, it is a bequest to charity generally, indicating a general indefinite charitable purpose, and must so remain. The discretion of the executors, which was to give this general indefinite charitable purpose locality and precision, in other words, to point out the object of the charity, is gone, and can never be exercised.

*Secondly.* If the societies indicated be, as was insisted on, the real beneficiaries, who is to say what societies, and where located ? Not the slightest intimation is given in the will on this subject, and those to whom the discretionary power of selection was given, having refused to accept the trust, consequently the will of the testator is defeated. See case of *Female Asso-*

*ciation of New York* v. *Beekman,* (21 *Barb.* 565,) where this court held that under this bequest, there was no known *cestui que* trust; that the will gave to the trustees full discretionary power as to the execution of the same, and that in the exercise of this power, they were not restricted to any territory or country.

But assume, as was urged, that the societies indicated were organized societies for the support of the indigent, especially females and orphans, it is conceded that we have such in this state, and in other states, corporate and unincorporate. Assuming the latter as the ones indicated, then we have the principles settled by the court of Appeals in the case of *Owens* v. *The Methodist Missionary Society,* as applicable to this bequest. In that case the society was the legatee to which the bequest by Owens was intended to be made; and the only question was, whether a bequest to such an association was valid. It was unincorporated at the time the bequest was made, but incorporated subsequently. It was held, however, that the circumstance made no difference. In the opinion of the court, it is said, that for the appellants, the society, two points were made which are directly in conflict. "It is insisted, *First.* That the bequest to the missionary society is absolute, and not qualified or limited by any trust whatever; and *Secondly.* That it is valid as a charity. These two positions are inconsistent, and cannot stand together. Nothing is a charity, in a legal sense, except what is limited to some charitable use. But if this bequest is unaccompanied by any *trust,* the fund might be appropriated by the association to the establishment of a gaming-house, or any other immoral purpose; or it might be distributed among and pocketed by its members. An *absolute* gift or bequest to an unincorporated missionary society is no more 'a charity' than an absolute gift to an individual. In legal contemplation, 'charity' and 'charitable use,' are convertible terms, and there can be no charitable use without a trust. To deny that this bequest was accompanied by a trust, therefore, is to deny

that the law of charitable uses applies to this case, and this, of course, is to deny the validity of the bequest. Nothing is better settled than that a devise or bequest to an unincorporated association is in general void, as well in equity as at law. It is only by virtue of that peculiar jurisdiction exercised by courts of equity in regard to charitable uses that such bequests have ever been sustained. To uphold this bequest, therefore, it is indispensable to maintain that the missionary society, if successful in obtaining the fund in question, would be bound to appropriate it to some pious or charitable use. If then a bequest, *unaccompanied by any designation of the purposes to which it is to be applied,* be made to a society whose name and public acts indicate that its objects are religious or charitable, there is an *implied* trust which limits the use to such objects. When the bequest is to a corporation, because the objects, purposes and powers of the corporation being in all cases more or less clearly defined by its charter, the bequest may fairly be presumed to have been intended for those specific objects. But we have no such criterion for ascertaining the nature and purposes of a voluntary association. They may be pious to-day and impious to-morrow. There is no law to prevent or restrain such changes." For these reasons the bequest in that case was held void. In the present case no attempt ever was made to show that these societies, if successful in obtaining these moneys, would be bound to appropriate them to any pious or charitable use. The bequest is unaccompanied by any designation of the purposes to which it is to be applied. No implied trust would be created, and these funds might be appropriated to the establishment of a gaming house, or any other immoral purpose, or it might be distributed among and be pocketed by the members. "There is no law to restrain such changes." Upon the principles settled by the court of appeals, and the authority of that case, these bequests to these societies cannot be sustained. But assuming, as it was also urged on the argument, that from the context

of the will it appears that it was the intention of the testator to designate incorporated societies, and that this court was bound to assume that he intended incorporated societies, the inquiry presents itself, how can the bequests be maintained in the absence of the designation of any societies, and any evidence of the powers conferred on them by their acts of incorporation ?

In *Williams* v. *Williams*, the bequest to the religious corporation was sustained upon the ground that it was authorized by its act of incorporation to take for the use of the church. Denio, J., says : " The class of corporations to which the legatee in this case belongs, are authorized by the statute to purchase and hold real and personal estate," for the use of such congregation or society, by § 4 of the act to incorporate religious societies ; and on this ground the conveyance to St. Clement's church was upheld by the superior court, and doubtless by the court of appeals ; and we have seen in the case of Owens, that significance was attached to the fact that in that case the bequest was not to an incorporated society. But we have no ground to assume that these bequests were intended for incorporated societies, or that the executors, in the exercise of their discretionary power, would have selected incorporated societies ; or that this court, in the scheme to be framed, will confine the bequest to incorporated societies. Considering the circumstances under which this codicil has been made, and the emphatic condemnation placed on this and similar dispositions, made to corporations, by the legislature of this state, since the making of this codicil, this court is restrained, as well by such expressions of the legislative will, as by the considerations expressed by Lord Eldon, in *Moggridge* v. *Thackwell*, of his great regret that he was reluctantly driven to disappoint the natural expectations of those who otherwise would receive the property of the testatrix, from extending by construction the objects of these bequests, or supplying any defects in the attempt to commit this natural injustice. The English statute of 9 Geo. 2,

chap. 36, usually called the mortmain act, enacted "that no lands or personal estate, to be laid out in lands, should be given or settled, to or upon any person, bodies politic or corporate, in trust, or for the benefit of any charitable use whatsoever, unless the same be created twelve calendar months before the death of the donor." It is observed by the learned writer, to whose work reference has been made, that "never indeed, was the spirit of any legislative enactments more rigorously and zealously seconded by the *judicature,* than the statute of 9 Geo. 2." (1 *Jarman on Wills,* 211.) And the reasons for this statute, and the unvarying determination of the English judges to uphold it, are so potent, and have been so often eloquently and forcibly urged, that their recapitulation is quite unnecessary. They are familiar to every member of the profession. The legislature of this state repealed the mortmain act, and it is now well established that it was never in force here. But since the making of this will, the legislature has passed a law which, if it had been in force at the death of this testator, would have decisively settled the question now under consideration, so far at least as any society incorporated under said act is concerned. It is, in substance, a re-enactment of the mortmain act, so far as it relates to benevolent, charitable, scientific and missionary societies. It is found in the 6th section of the general act authorizing the incorporation of such societies, passed April 12, 1848, (*Laws of* 1848, *p.* 447,) and it is as follows: "Any corporation formed under this act shall be capable of taking, holding or receiving any property, real or personal, by virtue of any devise or bequest, contained in any last will or testament of any person whatsoever, the clear annual income of which devise or bequest shall not exceed the sum of ten thousand dollars; provided no person leaving a wife, or child, or parents, shall devise or bequeath to such institution or corporation, more than one-fourth of his or her estate, after the payment of his or her debts, and such devise or bequest shall be valid to the extent of such one-fourth. And no such devise or bequest shall be valid *in any will,* which shall not have been *made and executed at least two months before the*

*death of the testator."* The learned author, on equity juris-prudence, says that "this provision was made to guard against improvident testamentary disposition of property by persons *in extremis,* in derogation of the claims of near rel-atives." (*Willard's Eq. Juris. p.* 576.) The testator died on the 20th of October, 1838. The codicil containing these bequests was made on the 13th of October in the same year, seven days before his death. It was made, therefore, *in ex-tremis,* within the time prohibited by the act of the legisla-ture. This very case shows the propriety of that act, to prohibit the "improvident testamentary disposition of prop-erty by persons *in extremis,.* in derogation of the claims of near relatives." I have been unable to find any principle upon which it can be sustained. The decisions of our courts, the genius and spirit of our institutions, and the express dec-laration of the legislature, alike imperatively forbid it.

I have thus discussed the validity of these bequests in the various aspects in which they have been presented, and in none can I find any authority for maintaining them, and while I differ with diffidence from the learned judge at spe-cial term, who saw his way clear in upholding them, my own convictions are unfaltering that they are invalid. I have not entered into the discussion which the subject invites, how far our statutes, restraining perpetuities and accumulations, would be nullified by maintaining these bequests. I have a very clear conviction in my own mind, that it will be ulti-mately found that the effects and provisions of these statutes cannot be avoided, by directing the accumulation of prop-erty real or personal, in trust for religious, pious, or char-itable uses. It seems to me, that the policy of our legislation has been to make real and personal estate easily vendible, and that its alienability should be restricted as little as possible. That statutes which prohibit alienation of lands for a longer period than two lives in being cannot be evaded, by devising them in trust for a pious or charitable use, and thus rendering them inalienable forever. And why

should a man be permitted, by devising his property for the benefit of poor relations, to keep it *in solido* for centuries, nay, forever, while in reference to his own children, he is not permitted to keep it inalienable but for two lives in being ? " Eleemosynary corporations," says Shelford, " are such as are constituted for the perpetual distribution of the free alms and bounty of the founder of them, to such persons as he has directed." (*Treatise on Mortmain, p.* 23.) And in *Dart-mouth College* v. *Woodward,* (4 *Wheat.* 641, 642,) Ch. J. Marshall said that the college was an " eleemosynary insti-tution, incorporated for the purpose of *perpetuating* the application of the bounty of the donor, to the specified objects of that bounty ;" and, further on he said, that the consideration of the gift of the donor was, " the perpetual application of the fund to its object in the mode prescribed by them." Lewis on Perpetuities (*p.* 688) says, "Lands thus dedicated to the service of charity and religion, are therefore practically inalienable." The class of corporations author-ized by statute to purchase and hold real estate and personal estate, " for the use of such church, congregation or society," are legally immortal, and it is the very nature of contribu-tions to them to withdraw the subject of them from every kind of circulation. " In all these cases," says Lewis, " the law against perpetuities is substantially superseded since the exercise of the privilege conferred by the legislature, entirely withdraws the land alienated from commerce and circu-lation," (*p.* 708.) Wright, J., in *Yates* v. *Yates,* (*supra,* appropriately says, " Public policy therefore demands that the alienation of property, for any purpose, shall not be unrea-sonably suspended. The legislature with the experience of all Christian nations before them, and with a knowledge of the mischiefs resulting from such suspension, have defined its limits. It is our duty to apply the law though the charity may fail. It were better indeed that it should fail, than that this court should falter in giving full effect to a wise and salutary restriction." Again he says, " Other views may be

taken in connection with the words, to show that the legislature intended to embrace public as well as private trusts. The same mischief was to be guarded against in the one case as in the other. The same reasons of public policy were applicable to each. If by one executory devise or private trust, the alienability of property could be suspended and the same excluded from commerce, so it might be, and had been in times past through the instrumentality of a public and charitable trust. Indeed the chances that it would be in the latter way was most to be apprehended; for, apart from the imposition that may be successfully practiced upon men in a dying hour, there is a desire in human nature, evincing itself strongly in some, to win in their last moments, what perhaps they have failed through life to obtain, the applause of the world as public benefactors; locking up their property and beggaring those connected with them by the ties of blood, to accomplish the end."

Emott, J., in *McCaughal* v. *Ryan,* (*supra,*) well observes: " There is nothing, I apprehend, in the history of this, more than can be found in that of other countries, which should induce us to relax any of the restraints thus imposed upon corporations, even if they be ecclesiastical or charitable. Large landed endowments among us, even for the best objects and, though supposed to be in the best hands, do not commend themselves to impartial observers by commensurate benefits to the state, their corporators, or the great objects of religion and beneficence which they may have been created to serve. If permitted they become obviously a marked and emphatic exception to our whole system of laws regulating the ownership, disposition and descent of lands, and an exception which is not called for by any necessities of society or of indviduals. * * * But if a rule shall be introduced which shall repeal the statutes of uses and trusts as to such devises, or make them an exception to its terms, it is manifest that all those barriers will be swept away, and those provisions, in effect, abolished at a blow. Of what avail will

it be to forbid a devise to a corporation if the devise can be made to an individual in trust for the benefit of the corporation and be valid ?    *   *.   *    In short, if I do not misconstrue the doctrine which is now earnestly contended for to sustain such devise as that before us, and which recent cases of high authority are supposed to favor, it would be a marked step backward, leading to the entire overthrow of the entire settled policy of the state upon these questions. I think such a course must eventually bring after it a retribution and a correction in statutes of mortmain, and similar stringent measures. The evils at which these are aimed are no less evils now than they were three hundred years ago, and we can see that all the increase and diffusion of knowledge during the past three hundred years have been insufficient to prevent these mischiefs in our mother country, since within a hundred years it has been found necessary to enforce the policy of the realm in this regard, and to protect the interest of the subject by the present statute of mortmain. The motives to which these pious and charitable donations, or those who ask them, appeal, are the most powerful in the human heart, and the time when they are generally called into action is the moment of greatest sensibility to religious hopes and fears, and to the assumed or admitted power of those who wield them, accompanied, we may often apprehend, by an unjust indifference to other claims of greater. merit, and at least, equally pressing necessity. If the state is to exercise any control over the tenure and disposition of the property and especially the landed property of its citizens, I am convinced that here is not the point at which that control is to be laid aside or relaxed. It is impossible not to be reminded by this controversy to exempt charities from our law of trusts ; how uses were originally borrowed from the civil law by ecclesiastics, to evade the restrictions in the English law, upon their acquisition of lands, and of the long struggle and the continued exhibition of clerical ingenuity, of judicial assumption, and of legislative restriction, in English

legal history, in which this contrivance made so prominent a feature. The introduction or the restoration of charitable uses, as an exception to our explicit and universal statutory rules limiting trusts in lands, would be, it seems to me, just as plain an evasion, not only of that statute, but in effect of others to which I have referred, as can be found contrived by judges or lawyers in all that history.

I think it would be an unnecessary, as well as an unhappy departure from both the spirit and letter of our laws. There is no charity which cannot obtain the benefits of a charter to promote its objects, and religious [benevolent, charitable, scientific and missionary] societies are permitted to become incorporate, simply by the observance of certain forms. The right to hold lands and receive their income is thus conferred, and at the same time regulated and restricted; and it is enough for all purposes of private bounty, as well as for the higher object of the public good, that gifts should be made directly to those bodies, under the control of the law, and within *its wise limitations.*"

I need but to add that these views, so eloquently and conclusively urged by this learned judge, meet with my hearty concurrence and cordial approval. I regard them as fundamental in the administration of this branch of our jurisprudence, and the maintenance and perpetuity of these principles as vital to the welfare, happiness, and prosperity of the state. The legislature has declared its policy in this regard, and it is the imperative duty of the judiciary, in my judgment, to second this policy with the same zeal and earnestness that the English judges did, in reference to the mortmain act of that kingdom, and not present the example so little worthy of imitation, exhibited at an earlier period of its history, in devices and contrivances to evade and render inoperative the statutes restraining the acquisition of lands by ecclesiastical establishments.

The principles I have declared dispose of this case, the be-

quest of $6000 in trust, to purchase a farm for the benefit of the children of the testator's sister. That bequest seems to me clearly void because it is a trust not authorized by our statutes of uses and trusts, and is also void as unlawfully suspending the power of alienation for more than two lives.

The judgment of this court will be, that the decree or judgment of the special term be reversed, except that part of it which declares the bequest of $6000 in trust to purchase a farm, &c. void. That the testator died intestate as to all his real and personal estate, except that specifically given and devised, and that the residue thereof, being wholly personal estate, goes to the next of kin, to be paid over to them in due course of administration. That a judgment be entered accordingly; and that the costs of all parties to this suit, with a reasonable allowance for counsel fees, to be certified by one of the justices of this court, be paid by the administrator, out of the funds of the estate.

[NEW YORK GENERAL TERM, May 3, 1858. *Davies, Clerke* and *Sutherland,* Justices.]